**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION**

| | |
|---|---|
| BANK OF CAMILLA, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :   Case No. 1:12-CV-15 (WLS) |
| | : |
| ST. PAUL MERCURY INSURANCE CO., | : |
| | : |
| Defendant. | : |

## ORDER

Before the Court is Defendant's Motion for Judgment on the Pleadings (Doc. 13), Plaintiff's Motion for Summary Judgment (Doc. 15), and Defendant's Cross-Motion for Summary Judgment (Doc. 18). For the following reasons, Defendant's Motion for Judgment on the Pleadings (Doc. 13) is **GRANTED**, and Plaintiff's Motion for Summary Judgment (Doc. 15), and Defendant's Cross-Motion for Summary Judgment (Doc. 18) are both **DENIED WITHOUT PREJUDICE.**

## PROCEDURAL BACKGROUND

Defendant filed its Motion for Judgment on the Pleadings (Doc. 13) on July 27, 2012. Plaintiff's Response (Doc. 15) was filed as both a Motion for Summary Judgment and a Response to Defendant's Motion for Judgment on the Pleadings.[1] In an abundance of caution, Defendant filed both a Reply to its Motion for Judgment on the Pleadings (Doc. 17) and its own Cross-Motion for Summary Judgment (Doc. 18). Defendant then filed a Response (Doc. 19) to Plaintiff's Motion for Summary Judgment, but also characterized the Response (Doc. 19) as a

---

[1] The Docket reflects the error made in the filing: "Plaintiff's Response to Defendant's Motion for Judgment on the Pleadings was filed as part of their brief at Doc. #15. Should have been filed as a separate document, but error was overlooked at the time of the filing."

1

brief in support of its own Cross-Motion for Summary Judgment. Plaintiff issued a final Reply (Doc. 20) against *all* motions and responses filed by Defendant.

While Federal Rule of Civil Procedure 12(d) allows the Court to convert a motion under Rule 12(b)(6) or 12(c) if matters outside the pleadings are presented to and not excluded by the Court, the rule makes no provision for a party to unilaterally convert a *response* to a Rule 12(c) motion into an entirely new motion for summary judgment. To do so would result in the present situation: an infinite loop of responses and replies, with a periodic motion to restart the cycle. The appropriate procedure would have been to separately file a Response and, if desired, a separate motion for summary judgment. The Court will not condone Plaintiff's failure to properly do so, especially when it caused the resulting filing of a dispositive motion for no other reason except to address Plaintiff's erroneous filing. (*See* Doc. 17 at 1.) Accordingly, the Court will consider Plaintiff's filing at Docket No. 15 solely as a Response to Defendant's Motion for Judgment on the Pleading, and will not consider all filings that are responsive to Plaintiff's Motion for Summary Judgment, including Defendant's Response (Doc. 19) and Plaintiff's Reply (Doc. 20). The Court also **DENIES WITHOUT PREJUDICE** Defendant's Cross-Motion for Summary Judgment (Doc. 18) and Plaintiff's Motion for Summary Judgment (Doc. 15). The Court finds that only Defendant's Motion for Judgment on the Pleadings (Doc. 13) is fully and properly before the Court, briefed, and ripe for ruling.

## FACTUAL BACKGROUND

### 1. The 2007 Policy

In 2007, Defendant issued its SelectOne for Community Banks Policy No. EC06800739 to Plaintiff, with a Policy Period of January 19, 2007 to January 19, 2010 (the "2007 Policy"). (Doc. 1-6 ¶ 4.)

**2.     The 2009 Complaint:**

In April 2009, Plaintiff was sued in Georgia Superior Court by a group of twenty-one individual investors who purchased debt instruments ("debentures") issued by Georgia Finance of Grady County, Inc. ("GFGC"). (*Id.* ¶ 12.) The 2009 Complaint alleged that the debt instruments were not registered with the Georgia Secretary of State as required by statute and that GFGC was not authorized to sell the debt instruments to the individual investors. (Doc. 1-8 ¶¶ 17-21.)

GFGC was a customer of Plaintiff. (*Id.* ¶ 22) The 2009 Complaint alleged that Plaintiff, "notwithstanding its knowledge of these illegal and unauthorized activities by [GFGC]…continued to provide financial aid to [GFGC] through direct loans, overdraft of checking accounts, and excessive credit card charges," (*Id.* ¶ 26.) The 2009 Complaint also alleged that in return for the financial aid, GFGC issued promissory notes to Plaintiff as collateral for the debt GFGC owed Plaintiff. (*Id.* ¶¶ 23, 27.) Specifically, on September 5, 2008, Plaintiff was alleged to have procured promissory notes, secured by a security agreement and perfected by a financing statement, from GFGC that consisted of the bulk, if not all, of GFGC's assets, as further collateral for the debt owed to Plaintiff. (*Id.*) Plaintiff was alleged to have withheld the September 5, 2008, financing statement from the public record until after GFGC defaulted on the security agreement. (*Id.* ¶ 30.) The Complaint contended that on February 5, 2009, GFGC consented to delivery to Plaintiff of all property described in the September 5, 2008, promissory note, security agreement, and financing agreement, which "destroy[ed] the business of [GFGC]." (*Id.* ¶ 32.) On February 10, 2009, Plaintiff allegedly gave notice to GFGC and each of the individual investors that it "intended to dispose of the collateral of which it had taken possession 'privately on or after February 20, 2009.'" (*Id.* ¶ 33.)

3

Plaintiff allegedly disposed of the property prior to February 20, 2009 to Greene, "a corporation owned by a close relative to an insider of [Plaintiff]," and the individual investors argued that Plaintiff did not receive a reasonably equivalent value in exchange. (*Id.* ¶¶ 33-35.) The individual investors accused Plaintiff of "destroying the business of [GFGC], and its going concern value, to the detriment of [the individuals]," thus violating the provisions of the Georgia Uniform Fraudulent Transfer Act. (*Id.* ¶¶ 37-38.) The individual investors also accused Plaintiff of violating the terms of the UCC by not disposing of the collateral in a "commercially reasonable manner as to method, time, place, or terms." (*Id.* ¶ 36.)

**3.     Plaintiff's Admissions as to the Applicability of the 2007 Policy to the 2009 Complaint:**

In Plaintiff's state court Complaint, it asserted that because the individuals' claims in the 2009 Complaint fell within the definition of a "Lending Act," and the 2007 Policy excluded coverage for any "Lending Act," Plaintiff did not inform Defendant of the 2009 Complaint at the time it was filed. (Doc. 1-6 ¶ 15.)

**4.     The 2010 Policy:**

In December 2009, Plaintiff submitted to Defendant an application to renew Plaintiff's existing insurance coverage and add a new insuring agreement, the Bankers Professional Liability Insuring Agreement. (Doc. 14-1 at 23-25.) The Bankers Professional Liability Insuring Agreement added two new coverage areas, Lending Act Coverage and Professional Service Act Coverage. (*Id.*) In 2010, Defendant issued Plaintiff its renewal SelectOne for Community Banks Policy No. EC06801618 with a Policy Period of January 19, 2010 to January 19, 2011 (the "2010 Policy"). The 2010 Policy included separate Insuring Agreements for Management Liability, Employment Practices Liability, Fiduciary Liability, and Bankers Professional

Liability. (Doc. 1-12 at 11.) Defendant's duty in all four Insuring Agreements did not extend to the duty to defend. (*Id.* at 12-13.) The "prior litigation" date exclusion for the Fiduciary Liability Insuring Agreement and the Bankers Professional Liability Insuring Agreement was January 19, 2010. (*Id.*)

**5.     The 2010 Recast Petition:**

On October 27, 2010, the individual investors filed their Amendment and Recast Petition. (Doc. 1-15 at 27.) The Recast Petition deleted the majority of the factual allegations and all of the demands of the 2009 Complaint. It replaced both with allegations of a Ponzi scheme where GFGC used the money provided by the individuals to "liquidate prior investments to other investors, to make the monthly investment return payments to investors, to cover personal and business expenses, to fund [GFGC's President's] gambling activities, and to cover overdrafts with Plaintiff." (Doc. 1-15 ¶ 18.) The Recast Petition alleged that Plaintiff knew of GFGC's "true financial condition," was a part of GFGC's Ponzi scheme, and "willfully, knowingly, intentionally, and for compensation, repeatedly misrepresented to the [individuals]…the true financial condition of [GFGC]." (*Id.* ¶¶ 22-25.) Based on these factual allegations, the Recast Petition alleged a common-law fraud claim and a RICO claim against Plaintiff and GFGC. (*Id.* ¶¶ 26-40.)

**6.     Requests for Coverage**

In a letter dated November 22, 2010, Plaintiff informed Defendant of the Recast Petition and made a demand on Defendant for coverage under the policies issued by Defendant to Plaintiff. (Doc. 1-16 at 31-32.) By letter dated January 21, 2011, Defendant denied coverage under the 2010 Policy for the Recast Petition. (Doc. 1-16 at 33-36.) On June 1, 2011, Plaintiff and the individuals settled the fraud and RICO claims for $750,000. (Doc. 1-6 ¶ 30.) On

5

December 29, 2011, Plaintiff filed the instant action against Defendant in the Superior Court of Mitchell County, Georgia, alleging breach of contract and bad faith for failing to provide insurance coverage for claims made against Plaintiff for fraud and conspiracy in the Recast Petition. (Doc 1 at 1.) The case was removed to this Court on February 3, 2012. (*Id.*)

## DISCUSSION

**I.    Standard of Review**

Under Federal Rule of Civil Procedure 12(c), a party may make a motion for judgment on the pleadings after the pleadings are closed, but not early enough to delay trial where a complaint "fail[s] to state a claim upon which relief can be granted." "Judgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." *Palmer & Cay, Inc. v. Marsh McLennan Cos., Inc.*, 404 F.3d 1297, 1303 (11th Cir. 2005). The standard of review for a motion for judgment on the pleadings "is almost identical to that used to decide motions to dismiss." *Doe v. Bd. of Cnty. Comm'rs*, 815 F. Supp. 1448, 1449 (S.D. Fla. 1992). Fed. R. Civ. P. 12(b)(6) motions to dismiss standards therefore apply to Fed. R. Civ. P. 12(c) motions for judgment on the pleadings. *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 n.8 (11th Cir. 2002) (explaining that standard under both Rule 12(b)(6) and 12(c) is "whether the count state[s] a claim for relief"). When ruling on a motion to dismiss for failure to state a claim, the court must view the allegations of the complaint in the light most favorable to the plaintiff and consider the well pleaded allegations of the complaint as true. *Quality Foods de Centro Am., S.A. v. Latin American Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994-95 (11th Cir. 1983).

A court's review on a motion to dismiss is "limited to the four corners of the complaint." *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002). However, a court may

consider the complaint itself along any documents referred to in the complaint that are central to the claims. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (per curiam). Where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment. *Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.").

## II.     Choice of Law

In a diversity action, a federal court must apply the substantive law of the forum state. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938). Because the court has jurisdiction in this case based on diversity of citizenship, the court must apply the substantive law of the forum state—in this instance, Georgia. *See Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 427 (1996).

## III.    Analysis

### A.     Waiver:

The Court must first address Plaintiff's argument that Defendant "has waived the right to assert all defenses not explicitly articulated in its correspondence with" Plaintiff. (Doc. 15-1 at 1.) Plaintiff argues that under *Hoover v. Maxum Inde. Co.*, 730 S.E. 2d 413 (Ga. 2012), Defendant could not both deny Plaintiff's claim and reserve the right to assert other defenses later. Specifically, Plaintiff argues that Defendant's arguments that: (1) the Recast Petition alleges a Lending Act; (2) coverage is excluded by the Prior Litigation Exclusion in the Bankers

Professional Liability Coverage Part; (3) the Application Exclusions preclude coverage; and (4) the Recast Petition does not allege a Management Practices Act, are all waived because when Defendant denied Plaintiff's demand for coverage, it never asserted the defenses listed above in the denial letters issued to Plaintiff.[2]

Defendant contends that Plaintiff is attempting to amend its complaint and assert the waiver defense in a response to a motion to dismiss. Defendant argues that *Hoover* does not apply to this case because (1) the policy in *Hoover* involved an insurer's duty to defend rather than simply cover costs, (2) the court in *Hoover* held that an insurer waived a defense to coverage, not that the insurer waived the right to show that the claim was never covered, and (3) Defendant did not knowingly and intentionally waive any defenses, unlike the insurer in *Hoover*. Defendant argues that Plaintiff was fully aware of all of Defendant's defenses, as each was made clear in the correspondence between the parties. Finally, Defendant argues that even if *Hoover* does apply, "retroactive application of its holding would be improper," as Defendant justifiably relied on Georgia law at the time of the dispute.

The Court finds that *Hoover* is inapposite to this case. Georgia creates a Hobson's choice for insurance companies who have a duty to defend. When presented with a demand to defend, the company can either deny the demand or undertake the defense, with the resulting consequences. "By refusing to defend, the company loses all opportunity to contest the

---

[2] The Court's brief review of the denial letters reveals that at least two of the four listed defenses were asserted by Defendant. With respect to the defense that the Recast Petition alleges a Lending Act, Defendant's October 15, 2010 letter states repeatedly that "[t]he Petition alleges a Lending Act." (Doc. 17-1 at 50.) With respect to the defense that coverage is excluded by the Prior Litigation Exclusion in the Bankers Professional Liability Coverage Part, Defendant's October 15, 2010 letter asserted that "…[t]he 2010-2011 Policy…includes separate Insuring Agreements for Management Liability, Employment Practices Liability, Fiduciary Liability, and Bankers Professional Liability…each of the coverages under the various Insuring Agreements afford certain coverage for 'Loss' which an Insured becomes legally obligated to pay on account of a 'Claim' *first made against them during the Policy Period*." (Doc. 17-1 at 47.) Defendant also states in the same letter that "the Petition and the other materials submitted do not trigger coverage under the 2010-2011 Policy, because they do not constitute a Claim *first made* against an Insured during the Policy Period." (*Id.* at 45.)

8

negligence of the insured or the injured person's right to recover, and exposes itself to a charge of and penalty for breach of contract. By defending, it incurs considerable expense and may waive the claim of immunity." *LaSalle Nat. Ins. Co. v. Popham,* 188 S.E.2d 870 (Ga. Ct. App. 1972). Accordingly, the law provides a procedural remedy to the insurer who is facing this choice. "A proper and safe course of action for an insurer in this position is to enter upon a defense under a reservation of rights and then proceed to seek a declaratory judgment in its favor." *Richmond v. Ga. Farm Bureau Mut. Ins. Co.,* 231 S.E.2d 245 (Ga. Ct. App. 1976). *Hoover* clarified this situation, holding that an insurer could not both deny a claim for defense and attempt to reserve the right to assert a different defense in the future. *Hoover*, 730 S.E. 2d at 416 ("Maxum failed to properly reserve its rights to assert a notice defense when it denied EWES's claim…and refused to undertake a defense.")

Courts, however, have drawn a distinction between the duty to defend and the duty to pay costs, finding that a refusal to defend does not affect the insurer's right to refuse payment of costs. *See Penn-America Ins. Co. v. Disabled Am. Veterans*, 481 S.E. 2d 850, 852 (Ga. Ct. App. 1997) ("an insurer's duty to pay and its duty to defend are separate and independent obligations"); *Aetna Cas. & Sur. Co. v. Empire Fire & Marine Ins. Co.*, 442 S.E.2d 778, 783 (Ga. Ct. App. 1994) ("While it is true that an insurer loses its opportunity to contest the negligence of the insured or the injured person's right to recover by refusing to defend, the insurer does not lose its right to contest the insured's entitlement to a recovery under its policy."). As the 2010 Policy only provides for a duty to pay costs, the Court finds that Defendant's alleged failure to assert all eight defenses at the time of denial does not prevent it from raising those rights at a later time. The Court now turns to the defenses themselves.

### B. Coverage Under the 2010 Policy:

9

**Relevant Portions from the 2010 Policy:**

The Lender Liability Coverage Provision of the Bankers Professional Liability Insuring Agreement recites the following:

> If Lender Liability Coverage is granted...the Insurer shall pay on behalf of the the Insureds Loss for which the Insureds became legally obligated to pay on account of any Claim first made against them, individually or otherwise, during the Policy Period, the Automatic Discovery Period, or, if exercised, the Additional Extended Discovery Period, for a Lending Act taking place before or during the Policy Period.

(Doc. 1-15 at 11.) The term "Lending Act" is defined in the 2010 Policy as follows:

> Lending Act means, only with respect to a loan, lease, or extension of credit, any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed by an insured Person on behalf of the Company or the Company, in connection with or relating to:
> a. an agreement or refusal to grant or extend any such loan, lease or extension of credit;
> b. the granting or extending of any such loan, lease, or extension of credit;
> c. loan servicing, but only for such loan, lease, or extension of credit in which the Company has an ownership interest; or
> d. the restructure, termination, transfer, repossession or foreclosure of any such loan, lease, or extension of credit.

(Doc. 1-13 at 17.)  Under the Prior Acts Exclusion Endorsement, the 2010 Policy states:

> The Insurer shall not be liable for Loss on account of any Claim made against any Insured based upon, arising out of, or attributable to any Lending Act or Professional Services Act taking place prior to 01/19/10.

(Doc. 1-15 at 15.)

### i. The Exclusions to the Bankers Professional Liability Insurance:

Defendant argues that Plaintiff fails to state a claim upon which relief can be granted because the pleadings, which include the 2010 policy, establish that no coverage exists for the claims of the Recast Petition.  As such, Plaintiff cannot recover for its breach of contract and bad faith claims.  Defendant asserts that no coverage exists under the 2010 Policy because the

Bankers Professional Liability Insurance Agreement expressly provides that Defendant shall not be liable for any claim that constitutes a Lending Act or a Professional Services Act that occurred prior to January 19, 2010. Plaintiff contends that the Recast Petition does not allege a Lending Act or a Professional Services Act, so the exclusion does not apply and coverage does exist for the claims of the Recast Petition. The Court will first address whether the Recast Petition alleges a Lending Act.

### b. Definition of Lending Act:

The parties disagree as to the definition of a 'Lending Act' as set forth in the 2010 Policy. Defendant asserts that the 2010 Policy requires a 'Lending Act' to be any *wrongful* act encompassed by the language of the Policy. Defendant also contends that a 'Lending Act' cannot be truly independent of the underlying credit extension or grant of a loan because the language of the Policy requires that the wrongful act occur 'with respect to,' 'in connection with,' or 'relating to' the underlying act. In other words, Defendant would have 'Lending Act' mean any inaction or action that: (1) occurred 'with respect to,' 'in connection with,' or 'relating to' the underlying credit extension or loan grant; and (2) falls under the auspices of an "error, misstatement, misleading statement, act, omission, neglect, or breach of duty." (Doc. 17 at 6.)

Plaintiff contends that the phrases 'with respect to,' 'in connection with,' or 'relating to' are "addressed to situations in which [Plaintiff] - by some independent conduct apart from simply making a loan - acts improperly toward or breaches a duty owed to its customer in the process of extending credit to him or her...a bank would commit a Lending Act if it made a material misrepresentation or omission in a loan document; if it procured a fraudulent appraisal report; if it procured a forged signature on a promissory note; or if it engaged in some similar -- and similarly independent conduct." (Doc. 15-1 at 12-13.) In short, as best the Court can tell,

11

Plaintiff contends that the 2010 Policy requires a 'Lending Act' to be completely distinct and independent from the underlying loan or credit extension itself, but still be a part of the process leading up to, or resulting from, the underlying act.

"The rules of construction require the court to consider the policy as a whole, to give effect to each provision, and to interpret each provision to harmonize with each other." *ALEA London Ltd. v. Woodcock*, 649 S.E.2d 740 (Ga. Ct. App. 2007). In all breach of contract actions, a court must first determine whether the contractual language is clear and unambiguous. *Am. Empire Surplus Lines Ins. Co. v. Hathaway Dev. Co.*, 707 S.E.2d 369, 371 (Ga. 2011) ("The construction of a contract is a question of law for the court."). "Ambiguity exists where the words used in the contract leave the intent of the parties in question," that is, the parties' intent "is uncertain, unclear or is open to various interpretations." *Gen. Steel, Inc. v. Delta Bldg. Sys., Inc.*, 676 S.E.2d 451, 453 (Ga. Ct. App. 2009). "Conversely, no ambiguity exists where, examining the contract as a whole and affording the words used therein their plain and ordinary meaning, the contract is capable of only one reasonable interpretation." *Id.* at 453–54.

If the language of the contract is unambiguous, "the court simply enforces the contract according to the terms, and looks to the contract alone for the meaning." *Am. Empire Surplus Lines Ins. Co.*, 707 S.E.2d at 371 (internal quotation omitted). "Unambiguous language must be afforded its literal meaning and plain ordinary words given their usual significance." *Perkins v. M & M Office Holdings, LLC*, 695 S.E.2d 82, 84 (Ga. Ct. App. 2010).

The Court finds that Plaintiff's reading of a Lending Act unhelpful and contrary to the unambiguous provisions of the 2010 Policy. The terms of the 2010 Policy are clear, precise, and unambiguous and allow for only one reasonable interpretation – a broad reading of what constitutes a 'Lending Act' that is not limited to "independent conduct." The phrases 'with

respect to,' 'in connection with,' or 'relating to,' by their plain meaning, discredit Plaintiff's contention that a Lending Act must be independent from the underlying loan grant or credit extension, as each phrase binds the Lending Act to the underlying credit extension or loan grant. To require the three phrases to mean 'independent' renders the phrases meaningless. *See Georgia Farm Bureau Mut. Ins. Co. v. Gaster*, 546 S.E. 2d 30, 31 (Ga. Ct. App. 2001) (holding that the Court should avoid interpreting a contract in a way that renders portions of it meaningless).

Moreover, the remaining language of the 2010 Policy does not support a definition of 'Lending Act' that requires "independent conduct." *See Southern Trust Ins. Co. v. Dr. T's Nature Products Co.*, 584 S.E.2d 34, 36 (Ga. Ct. App. 2003) ("In construing an insurance contract, a court must consider it as a whole, give effect to each provision, and interpret each provision to harmonize with each other."); *See also* OCGA § 13–2–2(4) ("the whole contract should be looked to in arriving at the construction of any part"). The 2010 Policy states that a "Lending Act means…any error, misstatement, misleading statement, act, omission, neglect, or breach of duty…in connection with or relating to…[an] extension of credit". The conduct that falls under the spectrum of a 'Lending Act' is not limited by the 2010 Policy to require independence from the underlying act of a credit extension. A breach of duty can easily be directly dependent on the underlying act, and Plaintiff fails to cite to any authority or even argue to the contrary. Indeed, Plaintiff's attempt to read the phrases 'with respect to,' 'in connection with,' or 'relating to' to mean "independent" creates such a tortured definition of 'Lending Act' that Plaintiff itself struggles to explain what a Lending Act actually is in accord with its interpretation. (*See* Doc. 15-1 at 12-13.)

Accordingly, the Court will not import the additional limitation of 'independent conduct' into the definition of a 'Lending Act.' The term, as defined by the 2010 Policy, means, "with respect to a loan, lease, or extension of credit, any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by any insured Person on behalf of the Company, or the Company, in connection with or relating to…the granting or extending of any such loan, lease, or extension of credit." (Doc. 1-13 at 17.)

### c. The Recast Petition Alleges a Lending Act

Having defined the term 'Lending Act,' the next question before the Court is whether the allegations of the Recast Petition allege a Lending Act.

Defendant argues that the factual allegations of the Recast Petition meet the definition of a Lending Act, as set forth in the 2010 Policy, in two ways. First, the Recast Petition alleges Plaintiff extended credit to GFGC every time Plaintiff paid a check presented for payment from GFGC's overdrawn account. Because the account was overdrawn, the extensions of credit hid the true financial condition of GFGC from the individual investors. Plaintiff had a duty to disclose the true financial condition to the individual investors, and its failure to do so breached that duty. Accordingly, Defendant argues that Plaintiff's failure to disclose the true financial condition of GFGC every time Plaintiff extended credit to GFGC meets the definition of a 'Lending Act.' (Doc. 17 at 5.) Second, Defendant argues that Plaintiff breached its duty not to conspire with, aid and abet acts of racketeering activity when it helped GFGC commit theft-by-taking through extending credit and paying the checks presented for payment from GFGC's overdrawn account, thereby concealing GFGC's Ponzi scheme. (*Id.*) Again, Defendant argues that this concealment of GFGC's Ponzi scheme, accomplished through extensions of credit, and resulting breach of duty to the individual investors meets the definition of a 'Lending Act.'

Plaintiff contends that as the factual allegations in the Recast Petition allege nothing more than an extension of credit, the Recast Petition does not allege a Lending Act.

In cases involving liability insurance, whether coverage exists depends solely on the allegations of the underlying suit against the insured. *Penn–America Ins. Co. v. Disabled Am. Veterans, Inc.,* 481 S.E.2d 850 (Ga. Ct. App. 1997); *State Farm Fire & Cas. Ins. Co. v. White*, 777 F. Supp. 952, 953–54 (N.D. Ga. 1991). The critical issue is whether the suit alleges a claim that is covered by the policy. *O'Dell v. St. Paul Fire & Marine Ins. Co.,* 223 Ga. App. 578, 579, 478 S.E.2d 418, 419 (1996). Therefore, in the instant case, the Court must compare the terms of the insurance contract to the allegations in the complaint to determine whether the underlying suit seeks damages for covered claims.

The Recast Petition alleges the following:

> Defendant Bank held the checking account of [GFGC] upon which it drew its checks for payment to investors and to the supplying entities…Defendant Bank willfully, knowingly, intentionally, and for compensation, repeatedly misrepresented to the [individual investors] and supplying entities the true financial condition of [GFGC] by falsely representing to them that there were sufficient good funds in the [GFGC] account for payment of the check at the time of presentment through the payment of the check, when in fact there was not, rather than disclosing to them that were in fact not sufficient good funds in the account with which to pay the check on presentment by returning the check for the reason of not sufficient funds.

(Doc. 1-16 ¶¶ 21-25.) The Recast Petition also states that Plaintiff "knowingly conspired with, aided and abetted, and participated with [GFGC] in concealing…the Ponzi scheme and theft by taking by not returning to the investors for 'Not Sufficient Funds' checks written to them by [GFGC] on its account." (*Id.* ¶ 39.) As set forth above, the 2010 Policy defines a Lending Act as "…with respect to a[n]…extension of credit, any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed by an insured Person on

15

behalf of the Company or the Company, in connection with or relating to…the granting or extending of any such extension of credit." (Doc. 1-13 at 17.)

The Court finds that the Recast Petition alleges a Lending Act under the 2010 Policy. It is undisputed that Plaintiff's alleged payments of overdrafts on GFGC's account constitute an extension of credit. (*See* Doc. 15-1 at 13; Doc. 17 at 6.)   The Court finds that Plaintiff's alleged misrepresentations to the individual investors, which allegedly occurred with every extension of credit, falls under the definition of a 'Lending Act,' as the definition includes misstatements, omissions, and breaches of duty, all of which were alleged in the Recast Petition.   Moreover, Plaintiff's alleged concealment of the Ponzi scheme in connection with the extensions of credit also fall under the definition of a 'Lending Act,' as the definition includes an act, omission, or a breach of duty, all of which were alleged with respect to the alleged concealment.

### d. Exclusion of Claims Arising from Lending Acts:

Defendant argues that because the 'Lending Acts' occurred prior to January 19, 2010, no coverage exists under the Bankers Professional Liability Insurance Agreement's Prior Acts Exclusion Endorsement. (Doc. 14 at 11.)   Defendant asserts that the exclusion precludes coverage for claim made against any Insured "based upon, arising out of, or attributable to any Lending Act…taking place prior to 01/19/10." (Doc. 17 at 8.)   As Plaintiff's extensions of credit allegedly took places before early 2009, the Lending Act occurred prior to the initial coverage date, and the exclusion applies.

Plaintiff contends that "no reasonable speaker of English could intelligibly maintain that" the fraud and RICO claims alleged in the Recast Petition are in any way connected to the claims and foreclosure-related conduct asserted in the 2009 Complaint. Without citations to the record,

16

Plaintiff simply states that the claims alleged in the Recast Petition "cannot be said to be 'based upon' or 'attributable to' that foreclosure-related conduct" alleged in the 2009 Complaint.

The Prior Acts Exclusion Endorsement states, with respect to the Bankers Professional Liability Insuring Agreement, that

> The insurer shall not be liable for Loss on account of any Claim made against any insured based upon, arising out of, or attributed to any Lending Act or Professional Services Act taking place prior to 01/19/10.

(Doc. 1-15 at 15.) Georgia courts have given a broad interpretation to the words "arose out of" as found in exclusionary clauses. *See Jefferson Ins. Co. v. Dunn*, 496 S.E. 2d 696 (Ga. 1998). In *Jefferson*, the court found that when the words 'arising out of' were present in an exclusionary clause, such an exclusionary clause is focused solely upon the *genesis* of a plaintiff's claims, and if those claims arose out of the excluded culpable conduct, coverage need not be provided. *Id.* at 696. The court further opined that a claim will be found to have arose out of the excluded culpable conduct if there could be no claim but for that conduct. *Id.*

The Court finds that the exclusion applies. As the Court found above, Plaintiff's alleged fraudulent misrepresentations and concealment of the Ponzi scheme both fall under the definition of a 'Lending Act.' The individual investors' claims of deceit and conspiracy would not exist 'but for' the Lending Acts related to the extensions of credit, as both claims directly rely on Plaintiff's extensions of credit to GFGC. The Recast Petition alleges that all extensions of credit occurred between October, 2003, and December 31, 2007. (Doc. 1-16 ¶ 24-25.) Therefore, all Lending Acts alleged in the Recast Petition occurred between October, 2003, and December 31, 2007. The Prior Acts Exclusion Endorsement excludes coverage for claims that arose out of Lending Acts that occurred before January 19, 2010. Accordingly, as all alleged Lending Acts

in the Recast Petition occurred before January 19, 2010, coverage is excluded under the 2010 Policy for the claims of the Recast Petition.

Having concluded as a matter of law that there is no coverage under the 2010 Policy for the Recast Petition, the Court need not reach the merits of the remaining arguments made by the parties. As no coverage exists under the 2010 Policy for the Recast Petition, Plaintiff cannot recover on its breach of contract and bad faith claims against Defendant. Accordingly, as Plaintiff's Complaint fails to state a claim upon which relief can be granted, the Court **GRANTS** Defendant's Motion for Judgment on the Pleadings (Doc. 13).

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Judgment on the Pleadings (Doc. 13). is **GRANTED,** Plaintiff's Motion for Summary Judgment (Doc. 15), and Defendant's Cross-Motion for Summary Judgment (Doc. 18), improvidently filed as responses and/or replies to Defendant's Motion, are both **DENIED WITHOUT PREJUDICE**, and Plaintiff's Complaint is **DISMISSED** pursuant to Fed. R. Civ. P. Rule 12(c).

**SO ORDERED**, this  29th  day of March 2013.

/s/ W. Louis Sands
**THE HONORABLE W. LOUIS SANDS,**
**UNITED STATES DISTRICT JUDGE**